UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | | |
|---|---|---|---|
| SUZANNE M. STROM, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No. 4:13CV685 RWS | |
| | ) | | (TIA) |
| CAROLYN W. COLVIN, | ) | | |
| Acting Commissioner of Social Security, | ) | | |
| | ) | | |
| Defendant. | ) | | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration. The

suit involves Applications for Disability Insurance Benefits under Title II of the Social Security

Act and Supplemental Security income payments. Claimant has filed a Brief in Support of her

Complaint; the Commissioner has filed a Brief in Support of her Answer. The case was referred

to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b).

**I.     Procedural History**

Claimant Suzanne M. Strom filed Applications for Disability Insurance Benefits under

Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 63-66)[1] and Supplemental Security Income

payments pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq. (Tr. 122-

36). Claimant states that her disability began on June 14, 2008, as a result of COPD, pain in legs,

seizures, and suicidal thoughts. (Tr. 50). On initial consideration, the Social Security

Administration denied Claimant's claims for benefits. (Tr. 67-71). Claimant requested a hearing

---

[1]"Tr." refers to the page of the administrative record filed by the Defendant with her Answer
(Docket No. 11/filed June 24, 2013).

before an Administrative Law Judge ("ALJ"). (Tr. 26). On June 13, 2012, a hearing was held

before an ALJ. (Tr. 27-49). Claimant testified and was represented by counsel. (Id.). After the

hearing, the ALJ determined it necessary to obtain evidence through written interrogatories from

Vocational Expert Robin Cook. and elicited comment from counsel who submitted alternative

hypotheticals and additional questions for the vocational expert. (Tr. 118-20, 186-210).

Thereafter, on January 24, 2013, the ALJ issued a decision denying Claimant's claims for benefits.

(Tr. 5-21). The Appeals Council on March 13, 2013 found no basis for changing the ALJ's

decision and denied Claimant's request for review of the ALJ's decision. (Tr. 1-5). The ALJ's

determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.     Evidence Before the ALJ

### A.  Hearing on June 13, 2012

#### 1.  Claimant's Testimony

At the hearing on June 13, 2012, Claimant testified in response to questions posed by the

ALJ and counsel. (Tr. 29-49). Claimant's date of birth is November 29, 1963. (Tr. 33). She is

divorced and remarried, but she has been separated for fifteen years. Claimant lives with some

friends. (Tr. 33). She has a GED. (Tr. 34). Claimant has two dogs and cares for the dogs. (Tr.

44).

The ALJ found no past relevant work, because Claimant never performed at the SGA for

any appreciable length of time. (Tr. 38).

Claimant testified that at the time of the hearing she consumes a six-pack of beer each

week. (Tr. 36). She last used crack a week earlier. (Tr. 37). Claimant has taken prescription

drugs that were not prescribed to her to relieve the pain in her legs. (Tr. 37).

Claimant testified that she has some friends inside her head. (Tr. 39). She was abused as a child and was removed from her family home. (Tr. 40). Claimant experiences panic attacks, and she has problems breathing. (Tr. 42). Claimant has never talked to another psychiatrist other than Dr. Monolo. (Tr. 42). Her leg pain affects her activities during the day and causes her to just want to sit. (Tr. 45). She testified that she also has arthritis in her hips and knees. (Tr. 46). Claimant takes combivent for her breathing problem. (Tr. 48).

Claimant testified that she goes up and down the steps a lot during the day, because she helps with the laundry in the basement. (Tr. 46).

## 2. Forms Completed by Claimant

In the Disability Report - Adult, Claimant reported she stopped working on July 9, 2011 after she "got mad and walked out on the job." (Tr. 153). Claimant noted the she does not have insurance and cannot afford to pay for the medications she needs. (Tr. 159).

In the Function Report - Adult completed on October 25, 2011, Claimant reported doing all the household chores and being able to walk and drive a car and go shopping in stores. (Tr. 164-65).

In the Disability Report - Appeal, Claimant reported her depression and PTSD hinder her ability to stay on task and deal with people. (Tr. 177).

## 3. Testimony of Vocational Expert

Vocational Expert Robin Cook testified in response to the ALJ's interrogatories. (Tr. 192-93). Dr. Cook testified that Claimant has past relevant work as a nurse aide, tamale machine feeder, a housekeeping cleaner, a waitress, and a bartender. (Tr. 192).

The ALJ asked Dr. Cook to assume that

a hypothetical individual who was born on November 29, 1963, has at least a high school education and is able to communicate in English as defined in 20 CFR 404.1564 and 416.964, and has work experience as [a housekeeping cleaner and a tamale machine feeder] .... Assume further that this individual has the residual functional capacity (RFC) to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except unable to climb ladders, ropes or scaffolds, can occasionally climb ramps or stairs, kneel, crouch or crawl. She is further limited to work that involved only simple, routine, repetitive tasks in a low stress job defined as requiring only occasional decision making and only infrequent changes in the work setting with no interaction with the public, only casual and infrequent contact with co-workers and contact with supervisors concerning work duties (when work duties are being performed satisfactorily) occurring no more than four time per workday.

Could the individual described ... perform any of the claimant's past jobs as actually performed by the claimant or as normally performed in the national economy?

(Tr. 192-93). Dr. Cook opined that such an individual could perform past relevant work as a housekeeping cleaner and a tamale machine feeder and unskilled jobs such as a garment sorter and sewing machine operator. (Tr. 193).

Claimant's counsel submitted additional interrogatories for the vocational expert. (Tr. 203-04). Counsel asked Dr. Cook as follows:

Please assume an individual with the same age, education, and prior work experience as identified. Please assume that individual is limited such that she would be absent from work 2 days per month secondary to depressive symptomology. Would such an individual be capable of any past work or any other work? If so, please list the jobs with their corresponding DOT number.

(Tr. 203). Dr. Cook opined that "[a]n individual who would miss two days of work a month would be incapable of engaging in full time competitive work. (Tr. 205).

Next, counsel asked as follows:

Please assume an individual with the same age, education, and prior work experience as identified. Please assume that individual is limited such that she would be absent from work 2 days per week  secondary to depressive symptomology. Would such an

- 4 -

please list the jobs with their corresponding DOT number.

(Tr. 203).  Dr. Cook provided the same response noting that since two days a week is more frequent than that specified previously.  (Tr. 205).

> Lastly, counsel asked as follows:
>
> Please assume an individual with the same age, education, and prior work experience as identified.  Please assume that individual would, on an ongoing basis and at unpredictable times, withdraw from the workstation or interact in any angry, inappropriate manner twice per week with coworkers and supervisors.  Would such an ongoing unpredictable rate of inappropriate behavior be consistent with the ability to perform any past work or any other work?  If so, please identify those jobs with their corresponding DOT numbers.

(Tr. 204).  Dr. Cook noted that withdrawal from the workplace and inappropriate behavior as set forth in the hypothetical are not compatible with sustained competitive employment.  (Tr. 205).

## III.    Medical Records

Claimant sought treatment for abdominal pain, esophageal pain, and occasional shortness of breath in the emergency room on October 13, 2007.  (Tr. 321).  She admitted to being a heavy smoker and consuming six beers each day.  (Tr. 321-22).  The doctor found Claimant has a history of alcoholism and pancreatitis and noted gastritis, Barrett's esophagus, GERD, and pancreatitis likely due to her alcoholism.  (Tr. 327).  She reported feeling much better after having a GI cocktail.  (Tr. 328).  The doctor diagnosed her with esophageal reflux.  (Tr. 332).

On November 4, 2008, Claimant sought treatment in the emergency room after taking a bottle of Sertraline and reported trying to kill herself.  (Tr. 306).  She noted she had consumed a twelve-pack of beer that night.  (Tr. 308).  The social worker provided mental health and substance abuse treatment resource lists, but she expressed no interest in treatment.  (Tr. 309).  Acute intoxication is listed as her chief complaint.  (Tr. 314).  Claimant admitted to being

intoxicated and then decided to kill herself by taking Sertraline thirty-five tablets and consuming twelve beers. (Tr. 314). The doctor instructed her to stop drinking alcohol and diagnosed her with alcohol abuse. (Tr. 320).

In the March 11, 2008 clinic note, Claimant reported pain in her legs and back and drinking eight beers a day. (Tr. 348). She noted the recent passing away of her housemate causing her to grieve and be depressed. (Tr. 348). Dr. Emani noted how she smelled of alcohol and could hear mild wheezing bilaterally. (Tr. 349). Dr. Emani instructed Claimant to stop drinking, and she refused a referral to alcohol support groups. (Tr. 349).

Claimant returned for treatment of her leg and stomach pain, weakness, and imbalance on March 20, 2008. (Tr. 285). She reported severe stomach pain and continued leg pain. (Tr. 285). The March 15, 2008 MRI of her brain showed normal results. (Tr. 286, 340-41). The March 14, 2008 abdominal sonogram showed tiny mobile gallstones with her gallbladder and slightly coarsened echotexture of her liver which could be compatible with early cirrhosis. (Tr. 287, 342). Dr. Emani diagnosed Claimant with Hepatitis C by serology. (Tr. 289). Dr. Emani noted how Claimant showed up with elevated EtOH level at last clinic visit. (Tr. 289).

In the March 20, 2008 Admission History, Claimant reported having abdominal pain, lower extremity weakness, and light-headedness occurring chronically over the past several months to greater than a year and recently increasing in frequency and intensity. (Tr. 244). Claimant admitted drinking large quantities of alcohol approximately fifteen beers daily, and after being apprised that she would be admitted directly from the clinic, she told the physician she needed to go home briefly and returned after consuming eight beer and four shots of vodka. (Tr. 244). She is out of her Prilosec due to lack of funds. (Tr. 245). She smokes one to three

packages of cigarettes a day. Claimant lives in the house of a former friend and drinks approximately fifteen beers on average and occasionally consumes hard alcohol. She has a history of IV drug use, cocaine and meth. (Tr. 245). In the assessment, Dr. Patrick White noted she has a history of chronic alcohol intoxication, pancreatitis, and recent Hepatitis C presenting with abdominal pain, intermittent lower extremity cramping, orthostatic hypertension likely secondary to alcohol abuse. (Tr. 246). Dr. White observed Claimant to ambulate without difficulty. (Tr. 247).

On April 10, 2008, Claimant reported being hospitalized two weeks earlier due to complications of alcoholism, labs drawn showed electrolyte imbalance and acidosis. (Tr. 282). She received IVF, had correction of her electrolytes, and was counseled on abstinence from alcohol. Claimant reported she is still drinking four to five drinks a night daily while still using BZDs. (Tr. 282). Dr .Emani stressed the importance of quitting alcohol to prevent worsening of overall health conditions and smoking cessation. (Tr. 283). Dr. Emani attributed her weakness/pain/imbalance to malnutrition and alcohol use. (Tr. 283).

Claimant returned for a routine follow-up visit on November 6, 2008 and reported being discharged from the emergency department after a suicide attempt. (Tr. 277). In an intoxicated state, she ingested thirty-five sertraline pills in a moment of rage after arguing with her boyfriend. She complained of leg pain throughout her calf and thigh muscles. Claimant reported she can only walk thirty to forty feet without becoming short of breath. She indicated she is cutting back her ethanol use to only twelve beers a day, down from twenty-four beers and smokes two packs of cigarettes each day. (Tr. 277). Dr. Hans Lee concluded in the assessment that her suicide attempt does not appear to have stemmed from a major depressive episode but more from a

moment of rage during her argument with her boyfriend. (Tr. 279). Moreover, he noted her "[p]oor judgment seems to have been exacerbated by her EtoH intake." (Tr. 279). Dr. Lee counseled Claimant on the consequences of EtoH abuse and noted she has early signs of cirrhosis and found "likely 2/2 to COPD given tobacco history." (Tr. 279). Dr. Lee was unsure of the etiology of her left leg pain and questioned whether the pain is possibly related to SSRI overdose or EtoH neuropathic pain. (Tr. 280). Although he encouraged Claimant to stop smoking, she indicated that she has no desire to quit at this time. (Tr. 280).

On November 6, 2008, Claimant arrived via ambulance to the emergency room at Barnes-Jewish Hospital and reported having a seizure at home after being seen in the clinic and unable to fill prescription because of the cost. (Tr. 291, 298). She drinks more than four drinks per day and smokes. (Tr. 292). She ran out of her gabapentin in March and had not had the prescription refilled. (Tr. 293). She admitted to having four drinks before the seizure. (Tr. 294). A social worker gave her a voucher for her seizure medicine. (Tr. 294).

On November 7, 2008, Claimant received treatment in the emergency room at Barnes-Jewish Hospital for a seizure. (Tr. 273).

On March 11, 2009, Claimant arrived in the emergency room at Barnes Jewish Hospital for treatment after cutting her wrists. (Tr. 215). Claimant denied drinking more than four drinks per day. (Tr. 216). Claimant reported having a history of depression. (Tr. 217). Claimant underwent an extensive psychiatric evaluation. (Tr. 218). Claimant reported drinking about eight beers and five shots of hard liquor prior to cutting her wrists with a razor, because she is upset about losing her home to a fire and her dog dying. (Tr. 222). The lab results showed her Ethanol level to be 237. (Tr. 226, 242). The nurse found Claimant to be a poor historian. (Tr. 230).

In the Inpatient Psychiatric Intake Assessment, Dr. Richard Hudgens found Claimant to have an Axis I diagnosis of substance-induced mood disorder, alcohol dependence, and rule out major depressive disorder; Axis III diagnosis of hepatitis C, pancreatitis, questionable seizure disorder, chronic obstructive pulmonary disorder, and chronic pain; and Axis IV diagnosis of financial stressors, alcohol/substance abuse, unemployment, and poor coping skills. (Tr. 238). Claimant sought treatment after slashing her wrists "in context of alcohol intoxication and argument with her boyfriend." (Tr. 239). She reported having been drinking whiskey and beer and acting out on an impulsive thought of slashing her wrists. Claimant had a previous suicide attempt in November 2008 when she overdosed on sertraline in a similar situation after having an argument and acting on her impulsive thoughts. She admitted to having increased stressors including the loss of several people including a close friend, report of stolen dogs by her neighbors, and financial with the problem in paying her rent for the apartment. She reported having a couple events of seizures but not having any memory of the events. (Tr. 239).

Dr. Hudgens noted that her leg pain remains undiagnosed despite several clinic visits. (Tr. 239). Although she has been given prescriptions for gabapentin, Vitamin B12, and folate supplementation, Claimant has not filled the prescriptions, secondary to cost. (Tr. 240). Claimant earned her GED at fifteen and a diploma from the Community College in 1991 in Business. She started using cocaine and marijuana at age ten and has used pretty much everything. Claimant smokes two packages of cigarettes a day. She reported working most of her life in construction, bartending, restaurant work, and care giving including home care and nursing home work. Claimant stopped working when the man she provided home care for in exchange for room and board passed away one and a half years ago. She explained how she cannot do any jobs

secondary to her chronic leg pain and lack of transportation. Claimant reported drinking all of her life, but she started drinking heavily, up to a fifth of hard liquor per day, by 1994-95 when she was diagnosed with pancreatitis. She stopped drinking hard liquor, but she consumes twelve to twenty-eight beers spaced throughout the day. Claimant reported that her alcohol abuse never interfered with her ability to get to her old jobs. (Tr. 240). In the mental examination, Claimant stated she will never drink hard liquor again causing Dr. Hudgens to conclude she was drawing a strong connection between the consumption and her self-cutting behavior. She reported her beer consumption not causing her any problems. (Tr.241).

In the plan, Dr. Hudgens opined that with respect to her self-injurious behavior, intoxicated state was connected in both episodes so such behavior is most likely due to substance-induced mood disorder and poor impulse control contributed to the behavior. (Tr. 242). Dr. Hudgens noted Claimant has risk factors including psychosocial and financial stressors, age, and previous suicide attempt. Dr. Hudgens decided to involuntarily admit her for further assessment and treatment for her suicidal act and substance-induced mood disorder. Dr. Hudgens noted Claimant endorses all the symptoms suggestive of alcohol dependence and decided to consult with a chemical dependency service for further assessment. Dr. Hudgens found no evidence of Hepatitis C or pancreatitis at that time. He found her chronic pain to be secondary to chronic arthritis with neuropathy and prescribed Tramadol. (Tr. 242).

In the March 14, 2009 Discharge Summary, substance induced mood disorder and alcohol dependence are listed as her principal and secondary diagnosis. (Tr. 212). Claimant received treatment for multiple superficial lacerations on her wrists in the context of intoxicated state after an argument with her boyfriend. (Tr. 212). Dr. Hudson admitted Claimant to Barnes Jewish

Hospital for further evaluation. (Tr. 213). Claimant denied any suicidal intent and reported her actions to be "more of 'attention seeking from boyfriend.'" (Tr. 213). Dr. Hudson observed Claimant "did not seem to have any depressive symptoms in the absence of alcohol intake.'" (Tr. 213). Dr. Hudson diagnosed Claimant with substance induced mood disorder taking into consideration her self-injurious behavior in the context of alcohol intoxication in the presence of stressors including financial and psychosocial stressors. Treatment included psychotherapy and education about coping skills and better strategies for dealing with stress. Treatment for alcohol withdrawal included Librium taper and B12, thiamine and nutritional supplements. Claimant was also provided with resources for both inpatient and outpatient chemical dependency programs. Claimant indicated that she was not interested in any inpatient program and mentioned being determined to quit hard liquor, but she showed interest in continuing to drink beer. Claimant showed good insight and judgment as to her problem of alcohol dependence and recognized her poor impulse control and self-injurious behavior were mostly secondary to her alcohol dependence. Dr. Hudson noted that Claimant did not seem very motivated for her rehabilitation program for alcohol dependence. (Tr. 213).

Claimant returned to the emergency room on March 15, 2009 for evaluation and treatment, but she left prior to being seen by a physician. (Tr. 264-68).

In the November 16, 2009 Psychiatric Review Technique, Dr. Marsha Toll noted how Claimant failed to appear for the consultative examination, and there insufficient evidence available. (Tr. 353-63).

On September 17, 2011, Dr. John Kirby performed an open appendectomy after Claimant came to the emergency room with clinical and radiographic evidence of appendicitis. (Tr. 366,

371-72, 448-53, 46769, 477-553).  Claimant reported a previous history of marijuana and meth use but not in the last year, and still consuming alcohol, smoking cigarettes, and using crack cocaine in a small amount daily.  (Tr. 454).  The CT of her abdomen showed acute appendicitis and cholelithiasis.  (Tr. 462-66, 554-55).  SW vouchered forty tablets of percocet for Claimant as medical team determined she really needed the medicine.  (Tr. 503).  Dr. Kirby included in the discharge instructions smoking cessation. (Tr. 610-12).

On referral by Angela Bennett, St. Louis Disability Office, Dr. Joseph Monolo completed a psychological evaluation on November 23, 2011.  (Tr. 384).  Claimant reported last working in a bar for four to five months in 2011 but quitting after having a disagreement with the owner. (Tr. 385).  She typically relates well to coworkers and owners when she worked in bars, but then she had disagreements in most of her other jobs at times led to termination.  Claimant reported having multiple sclerosis, COPD, and neuropathy and currently not under doctor care or taking medications due to lack of insurance and income.  (Tr. 385).  She has a history of alcohol use starting at an early age and uses crack cocaine every other day.  (Tr. 385-86).  Claimant has had legal difficulties related to her substance use including brief incarcerations for public intoxication. (Tr. 386).  She reported a history of bipolar symptoms including elevated and depressed mood, increased and decreased energy, racing thoughts, irritability, suicidal thoughts, and increased and decreased activities.  Claimant experiences a depressed state one to two days a week and spends most the day on the couch and not engaging in activity.  When she is not depressed she is active, and she cooks, cleans, and does the laundry.  (Tr. 386).  Dr. Monolo noted how "[t]he client agreed that she used multiple substances simultaneously for several years, with her use now typically restricted to alcohol and crack cocaine."  (Tr. 387).  Although she indicated that her

substance abuse did not contribute to her bipolar symptoms, she agreed that her symptoms occurred in the context of use. Dr. Monolo opined that the extent of her substance use is responsible for her emotional problems is unclear inasmuch as she has yet to have an extended period of abstinence from use. He found her employment has been affected by her angry outbursts and relationships with coworkers. (Tr, 387). Dr. Monolo listed bipolar disorder, NOS, and polysubstance dependence (in partial remission per client) in the diagnostic impressions and assessed her GAF to be 55. (Tr. 388).

In the December 6, 2011 clinic note, Claimant presented at Barnes Jewish Hospital for a new patient screening. (Tr. 393). She currently consumes a twelve-pack of beer each day and smokes crack cocaine every other day. (Tr. 393-95). Leg pain was her chief complaint. (Tr. 395). Dr. Djoumbi noted how Claimant had not been to the clinic for almost three years. (Tr. 395). Claimant requested narcotic drugs, but Dr. Djoumbi refused citing the clinic policy prohibiting the prescription of narcotics to patients who are actively using illicit drugs. (Tr. 396). She declined taking a UDS noting how she just celebrated her birthday with friends, and so she would fail UDS. Dr. Djoumbi noted how she has a substance induced disorder with prior suicidal attempt in 2008, and she is supposed to follow-up with Psych, but she reported she cannot get a ride to the appointments. (Tr. 396).

The December 14, 2011 hip, pelvic radiography showed mild degenerative disc disease at L4-L5. (Tr. 404). The abdominal sonography showed cholelithiasis without sonographic evidence of acute cholecystitis. (Tr. 406).

On February 14, 2012, Dr. Djoumbi noted how the hip/pelvis x-ray was essentially unremarkable. (Tr. 412). Claimant reported increased shortness of breath, ongoing pain in her

legs, and upper back numbness. (Tr. 415). Claimant became very angry during the visit at the clinic and accused Dr. Djoumbi of not helping her. Dr. Djoumbi noted how he had ordered an x-ray to figure out what was going on with her legs. (Tr. 412). Dr. Djoumbi offered a social work consultation to help with her medications, but she declined. Claimant responded she would prefer to transfer her care to another physician, and she admitted to using crack/cocaine two days earlier. (Tr. 412). Dr. Djoumbi opined that based on her behavior today in the clinic, Claimant has at the very least a personality disorder which is likely made worse by her polysubstance abuse. (Tr. 413). Dr. Djoumbi noted how Claimant would benefit from social work/behavior health, but she is not willing to do so. Dr. Djoumbi suspected her leg pain/numbness caused by neuropathy which may be related to alcohol but radiculopathy also possible. Dr. Djoumbi transferred her care to another physician in the clinic. (Tr. 413).

Claimant returned for follow-up at the clinic complaining of leg pain. (Tr. 419). Claimant reported being unsatisfied the care provided by Dr. Djoumbi noting he was not nice to her and only focusing on her alcohol and cocaine use. Claimant reported having a chronic cough and still smoking and being depressed. (Tr. 419). Claimant drinks about a thirty-pack of beer each week and smokes crack cocaine every other day. (Tr. 420). With respect to her chronic pain, Dr. Adam Anderson noted suspect neuropathy versus malingering citing how a doctor had previously prescribed gabapentin, but she never picked up the medication. Dr. Anderson prescribed Celexa to Schnucks' pharmacy for a $4 prescription and referred Claimant to SW for community pharmacists. (Tr. 420). He encouraged Claimant to cease smoking and consuming alcohol and referred to pharmacist in clinic for tobacco cessation tools and to SW for assistance with medicaid application and community resources. (Tr. 420-21).

## IV.    The ALJ's Decision

The ALJ found that Claimant has not engaged in substantial gainful activity since September 22, 2011, the application date.  (Tr. 10).  The ALJ found that the medical evidence establishes that Claimant has the impairments of alcohol dependence, cocaine abuse, bipolar disorder, degenerative disc disease, and hepatitis C, and she meets the listing requirements of 12.04 and 12.09.  (Tr. 10-13).  The ALJ found that if Claimant stopped the substance abuse, her remaining limitation would cause more than a minimal impact on her ability to perform work activities, and therefore she would continue to a severe impairment or combination of impairments.  (Tr. 13).  Further, the ALJ found if Claimant stopped the substance abuse, she would not have an impairment or combination of impairments, that meets or equals any of the listings in Subpart P, Appendix 1.  (Tr. 13-14).  Finally, the ALJ found that if Claimant stopped the substance abuse, she would have the residual functional capacity to perform light work except she is unable to climb ladders, ropes or scaffolds; she can occasionally kneel, crouch, crawl, and climb ramps or stairs; she must avoid concentrated exposure to extreme vibration and all operational control of moving machinery, working at unprotected heights, and the use of hazardous machinery; her work is limited to work involving only simple, routine, repetitive tasks; and she must work in a low stress job defined as work requiring only occasional decision making and only occasional changes in a work setting with no interaction with the public, only casual and infrequent contact with coworkers, and contact with supervisors concerning work duties (when work duties are being performed satisfactorily) occurring no more than four times per work day. (Tr. 14-20).

The ALJ found Claimant has no past relevant work.  (Tr. 20).  Claimant is a younger

individual with at least a high school education and is able to communicate in English. (Tr. 20).

Next, the ALJ found that if Claimant stopped the substance abuse, considering her age, education,

work experience, and residual functional capacity, there are a significant number of jobs in the

local and national economies she could perform including a garment sorter and a sewing machine

operator. (Tr. 20-21).

## V.     Discussion

In a  disability insurance benefits case, the burden is on the claimant to prove that he or

she has a disability.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the

Social Security Act, a disability is defined as the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  Additionally, the

claimant will be found to have a disability "only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education and work experience, engage in any other kind of substantial

gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and

1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an

ALJ in determining whether an individual is disabled.  First, the ALJ must determine whether the

individual is engaged in "substantial gainful activity."  If she is, then she is not eligible for

disability benefits.  20 C.F.R. § 404. 1520(b).  If she is not, the ALJ must consider step two which

asks whether the individual has a "severe impairment" that "significantly limits [the claimant's]

physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-42 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to

support his findings, regardless of whether substantial evidence exists to support a different

conclusion. <u>Haley v. Massanari</u>, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative

record and consider:

1. The credibility findings made by the ALJ.

2. The claimant's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The claimant's subjective complaints relating to
exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the
claimant's impairments.

6. The testimony of vocational experts when required which
is based upon a proper hypothetical question which sets forth the claimant's
impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

<u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is

conclusive upon this Court "if it is supported by substantial evidence on the record as a whole."

<u>Wiese</u> , 552 F.3d at 730 (quoting <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008).

"Substantial evidence is less than a preponderance but is enough that a reasonable mind would

find it adequate to support the conclusion." <u>Wiese</u>, 552 F.3d at 730 (quoting <u>Eichelberger v.</u>

<u>Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether

the Commissioner's decision is supported by substantial evidence, however, the Court must

consider evidence that supports the decision and evidence that fairly detracts from that decision.

Id. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Additionally, "'[a]n individual shall not be considered disabled for purposes of [SSI] if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor to the Commissioner's determination that the individual is disabled." Kluesner v. Astrue, 607 F.3d 533, 537 (8th Cir. 2010) (quoting 42 U.S.C. § 423(d)(2)(C) and noting that 42 U.S.C. § 1382(c)(a)(3)(J) has a similar provision for Title XVI. The claimant meets this burden if the ALJ "is unable to determine whether substance abuse disorders are a contributing factor to the claimant's otherwise-acknowledged disability...." Id. (quoting Brueggemann v. Barnhart, 348 F.3d 689, 693 (8th Cir. 2003)).

Claimant contends that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ's RFC is not supported by any medical evidence. Claimant also contends that the ALJ's hypothetical question to the vocational expert failed to capture the concrete consequences of her impairment.

A.    Residual Functional Capacity

Claimant contends that the ALJ erred in formulating the RFC inasmuch as the RFC is not

supported by some medical evidence.

A claimant's RFC is what he can do despite his limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). The claimant has the burden to establish his RFC. Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). The ALJ determines a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Eichelberger, 390 F.3d at 591; 20 C.F.R. § 404.1545(a). The ALJ is "required to consider at least some supporting evidence from a [medical professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace. Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (internal quotation marks and citation omitted). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Id.

The ALJ opined that, without substance abuse, Claimant has the residual functional capacity to perform light work as defined in the regulations except that she is limited to simple, routine, repetitive tasks, and she must work in low stress jobs requiring occasional decision making, occasional changes in the work setting, no interaction with the public, casual and infrequent contact with coworkers, minimal contact with supervisors concerning work duties.

When determining whether a substance abuse disorder is a contributing factor "[t]he key factor" is whether the claimant would still be found disabled if she stopped using the drugs or alcohol. 20 C.F.R. § 416.935(b)(1). When making this determination, the claimant's current mental and physical limitations are evaluated to assess whether they would remain if the claimant stopped using drugs or alcohol and, if so, whether the remaining limitations would be disabling.

20 C.F.R. § 416.935(b)(2). "When a claimant is actively abusing [alcohol], this inquiry is necessarily hypothetical, and thus more difficult than if the claimant had stopped." Kluesner, 607 F.3d at 537; accord Pettit v. Apfel, 218 F.3d 901, 903 (8th Cir. 2000). The relevant question is not only if the claimant's substance abuse was in remission at the time of the hearing, but whether it was active during much of the relevant period. Kluesner, 607 F.3d at 538; Vester v. Barnhart, 416 F.3d 886, 890 (8th Cir. 2005).

"[The claimant] carries the burden of proving her substance abuse is not a contributing factor material to the claimed disability." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (citing Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000)); accord Fastner v. Barnhart, 324 F.3d 981, 984 (8th Cir. 2003). On the other hand, if "[t]he ALJ is unable to determine whether substance use disorders are a contributing factor material to the claimant's otherwise-acknowledged disability, the claimant's burden has been met and an award of benefits must follow." Brueggemann, 348 F.3d at 693.

In the instant case, the ALJ found Claimant's disabling limitations would not remain if she stopped abusing alcohol. The medical evidence in the record shows Claimant continues to consume alcohol and use cocaine. The record is devoid of any evidence showing Claimant had stopped abusing alcohol or cocaine. An April 2008 treatment note shows Claimant had been hospitalized due to the complications of alcoholism. Although Claimant reported that her substance abuse did not contribute to her bipolar symptoms, she agreed that her symptoms occurred in the context of use. Dr. Monolo opined that the extent of her substance use is responsible for her emotional problems is unclear inasmuch as she has yet to have an extended period of abstinence from use. Likewise, Dr. Lee was unsure of the etiology of her left leg pain

and questioned whether the pain is possibly related to EtoH neuropathic pain. Dr. Hans Lee concluded in the assessment that her suicide attempt does not appear to have stemmed from a major depressive episode but more from a moment of rage during her argument with her boyfriend and he noted her "[p]oor judgment seems to have been exacerbated by her EtoH intake." Further, Dr. Hudgens opined that with respect to Claimant's self-injurious behavior, her intoxicated state was connected in both episodes so such behavior is most likely due to substance-induced mood disorder. When treating Claimant, Dr. Emani attributed her weakness/pain/imbalance to malnutrition and alcohol use.

Likewise, Dr. Hudson observed Claimant "did not seem to have any depressive symptoms in the absence of alcohol intake.'" Dr. Hudson diagnosed Claimant with substance induced mood disorder taking into consideration her self-injurious behavior in the context of alcohol intoxication in the presence of stressors including financial and psychosocial stressors. He found Claimant showed good insight and judgment as to her problem of alcohol dependence and recognized her poor impulse control and self-injurious behavior were mostly secondary to her alcohol dependence. Dr. Hudson noted that Claimant did not seem very motivated for her rehabilitation program for alcohol dependence. The record is devoid of any evidence showing that Claimant stopped abusing alcohol and cocaine.

Dr. Djoumbi suspected her leg pain/numbness caused by neuropathy which may be related to alcohol but radiculopathy also possible. Dr. Djoumbi transferred her care to another physician in the clinic. Further, when Claimant returned for follow-up treatment complaining of chronic pain, Dr. Adam Anderson noted suspect neuropathy versus malingering citing how a doctor had previously prescribed gabapentin but she never picked up the medication. Dr. Anderson

prescribed Celexa to Schnucks' pharmacy for a $4 prescription and referred Claimant to SW for

community pharmacists. He encouraged Claimant to cease consuming alcohol and referred to

pharmacist in clinic for tobacco cessation tools and to SW for assistance with medicaid

application and community resources. After considering all the medical evidence, the ALJ opined

that '[t]hese findings strongly support the conclusion that the majority of the claimant's problems

are related to her substance abuse issues, that she has not worked hard to address these problems

and has downplayed the extent of her substance abuse issues, and that, in the absence of such

substance abuse, the claimant retains significant functional ability." (Tr. 18).

As noted above, Claimant has the burden of proving that alcohol abuse "is not a

contributing factor material to [her] claimed disability." Estes, 275 F.3d at 725. The medical

records do not carry this burden given the incorporation in those records of Claimant's reports of

her continued drinking and cocaine use. This finding is supported by substantial evidence on the

record as a whole. See Baker v. Colvin, 2013 WL 5770600, at *6 (E.D. Mo. Oct. 24, 2013)

(affirming ALJ's decision that claimant would not be disabled but for substance abuse); Shaw v.

Astrue, 2010 WL 493832, at *6 (W.D. Ark. Feb. 5, 2010) ("Not withstanding the Plaintiff

repeated protest throughout her records that she is not an alcoholic the record is clear she abuses

alcohol on a regular basis and had done so for many years. Untying the Gordian Knot of

Alcoholism and Mental Impairments is compounded when, as here, the alcoholic abuse continues

through the evaluation period.").

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the

record as a whole. An ALJ's decision is not to be disturbed "'so long as the ... decision falls

within the available zone of choice. An ALJ's decision is not outside the zone of choice simply

because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" <u>Buckner v. Astrue</u>, 646 F.3d 549, 556 (8th Cir. 2011) (quoting <u>Bradley v. Astrue</u>, 528 F.3d 1113, 1115 (8th Cir. 2008)). Although Claimant articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above. Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

## B.     Hypothetical Question Posed to Vocational Expert

Claimant contends that the testimony of the vocational expert did not constitute substantial evidence upon which a determination could be made that Claimant was not disabled arguing only that the expert's opinion is flawed by not capturing the concrete consequences of her impairment.

The ALJ may seek the opinion of a vocational expert regarding jobs the claimant can perform. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1219 (8th Cir. 2001). The vocational expert will be asked to respond to a hypothetical question, posed by the ALJ, which includes all of the impairments of the claimant. The question must "precisely set out the claimant's particular physical and mental impairments." <u>Leoux v. Schweiker</u>, 732 F.2d 1385, 1388 (8th Cir. 1984).

The ALJ's hypothetical question posed to a vocational expert need not include alleged impairments which the ALJ has rejected as untrue. <u>Young v. Apfel</u>, 221 F.3d 1065, 1069 (8th Cir. 2000); <u>Long v. Chater</u>, 108 F.3d 185, 188 (8th Cir. 1997). As discussed above, the ALJ found that the medical record is devoid of any doctor finding or imposing any significant mental or physical limitations upon Claimant's functional capacity during the relevant time period. Although Claimant argues that she has more limitations than found by the ALJ, she does not

present any evidence demonstrating that she suffered restrictions more limiting than as determined by the ALJ and posed to the vocational expert in the hypothetical. Cf. Robson v. Astrue, 526 F.3d 389, 393 (8th Cir. 2008) (claimant did not identify what limitations were missing from hypothetical).

In addition, the undersigned notes that the ALJ based his hypothetical interrogatories on medical evidence contained in the record as a whole. Accordingly, Claimant's claim that the hypothetical opinion given by the vocational expert was flawed inasmuch as it relied on the RFC should be denied. This claim is without merit inasmuch as the hypothetical included those impairments the ALJ found credible. A proper hypothetical must include only those impairments accepted as true by the ALJ. Pearsall, 274 F.3d at 1220. Furthermore, an ALJ may omit alleged impairments from a hypothetical question posed to a vocational expert when "[t]here is no medical evidence that these conditions impose any restrictions on [the claimant's] functional capabilities." Haynes v. Shalala, 26 F.3d 812, 815 (8th Cir. 1994). Likewise, an ALJ may omit alleged impairments from a hypothetical question when the record does not support the claimant's contention that his impairments "significantly restricted his ability to perform gainful employment." Eurom v. Chater, 56 F.3d 68 (8th Cir. 1995) (per curiam) (unpublished table decision). The ALJ did not include the alleged impairment and subjective complaints that he properly discredited. See Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (ALJ may exclude alleged impairments he has properly rejected as untrue or unsubstantiated). Based on a proper hypothetical, the vocational expert testified that Claimant was able to perform jobs such as housekeeping cleaner, a tamale machine feeder, a garment sorter, and sewing machine operator with such jobs existing in significant numbers in the local and national economies. The vocational

expert's testimony provided substantial evidence to support the ALJ's determination that Claimant could perform light work with the exceptions set forth. Therefore, substantial evidence supports the ALJ's determination that Claimant was not disabled. Id.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. An ALJ's decision is not to be disturbed "'so long as the ... decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)). Although Claimant articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above. Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this 11th day of June, 2014.